## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cv-2172 (JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| JOANIE GORA, | |
| Defendant. | |

Brij Patnaik, United States Department of Justice, Tax Division, P.O. Box 7238, Ben Franklin Station, Washington, DC 20044, for Plaintiff United States of America

Eric William Johnson, Johnson Tax Law P.C., 101 East Fifth Street, Suite 910, St. Paul, Minnesota 55101, for Defendant Joanie Gora

JOHN F. DOCHERTY, United States Magistrate Judge

## I.    INTRODUCTION

The United States of America ("United States") brought this action against Curtis J. Olson and Kathleen M. Olson (collectively "the Olsons") to reduce to judgment federal income tax, interest, and penalty assessments for tax years 2010–2019; and against Joanie Gora for a monetary judgment and 50% penalty for failure to comply with a levy issued by the Internal Revenue Service ("IRS"). (Am. Compl. ¶¶ 1–2, Dkt. No. 23.) The United States commenced the action pursuant to 26 U.S.C. § 7401. (Am. Compl. ¶ 3.)

The United States' claims against the Olsons were resolved on October 16, 2023, when the Honorable Nancy E. Brasel, United States District Judge, granted the United

States' motion for summary judgment; however, the action against Ms. Gora continued. (Order Mot. Summ. J. at 2 n.1, Dkt. No. 40.) Judge Brasel entered judgment against the Olsons in the amount of $263,747.45, plus any statutory fees and interest that have accrued from May 10, 2023. (*Id*. at 6.) The Olsons have made payments on the amount, which was approximately $100,000 at the time of trial. (Bench Trial Tr. ("Tr.") 113:2–5, Dkt. No. 72.)

On September 23, 2020, the IRS issued a Notice of Levy with a cover letter to Ms. Gora as the tenant of the Olsons. (Am. Compl. ¶ 20; Pl.'s Exs. 5–6.) The United States seeks judgment under 26 U.S.C. § 6332(d)(1) against Ms. Gora in the amount of $24,150, plus interest, for rent payments; and an assessment under 26 U.S.C. § 6332(d)(2) of a 50% penalty for failure to honor the levy without reasonable cause. (Am. Compl. ¶¶ 25, 27.) The United States contends the Notice of Levy is lawful and should attach to Ms. Gora's rent payments for the period of November 2020 through July 2022 as her obligations were fixed and determinable, regardless of whether the month-to-month lease was written or oral at the time the levy was issued. (Pl.'s Post-Trial Proposed Findings of Fact and Conclusions of Law, Dkt. No. 75.) Ms. Gora disputes that she had a written fixed term lease at the time the levy was issued and contends that because there was no obligation in existence at the time of the levy for it to attach to, she did not fail to make payments to the IRS and is therefore not liable to the United States and should not be subject to a penalty. (Def.'s Post-Trial Br. at 3–4, Dkt. No. 74.)

By the consent of the parties, the case was referred to the Court on February 27, 2024, to conduct all proceedings and order the entry of a final judgment. (Reference Order, Dkt. No. 53.) The case was tried to the bench on July 23, 2024. After a transcript was

prepared and filed, the parties filed proposed findings of fact and conclusions of law (Dkt.

Nos. 74, 75). The Court took the matter under advisement at that time. Based on the

testimony and exhibits offered at trial, and the oral and written submissions of counsel, the

Court makes the following findings of fact and conclusions of law. *See* Fed. R. Civ. P.

52(a)(1).

## II.    FINDINGS OF FACT

### A.    The Subject Property

1.    The Olsons owned a house at 331 Seventh Street Southwest in Eyota, Minnesota
      (the "Eyota Property"). (Tr. 31:24–32:1.)

2.    Ms. Gora rented and moved into the Eyota Property in January 2019. (Tr. 32:2–
      12; 65:3–5.) Ms. Gora moved out of the Eyota Property in July 2022. (Tr. 32:13–
      15; 72:2–7.)

3.    When Ms. Gora moved into the Eyota Property in January 2019, Ms. Gora and
      the Olsons had not yet signed a lease. (Tr. 39:13–41:2; 65:6–8.) After Ms. Gora
      moved in, the Olsons planned to continue making improvements to the Eyota
      Property. (Tr. 40:7–15; 67:3–9.)

4.    Mr. Olson and Ms. Gora signed a lease dated February 1, 2019 (the "February
      Lease"). (Tr. 33:3–22; 65:20–66:5; Pl.'s Ex. 1.) Mr. Olson could not remember
      the exact date the lease was signed. (Tr. 46:8–20.) The United States presented
      evidence that the lease was signed on or about February 11, 2019 (Tr. 39:22–
      41:2), while Ms. Gora presented evidence that the lease was signed on or about
      November 22, 2020 (Tr. 65:6–18; 101:3–23). Ms. Gora testified at her

3

deposition that she had signed a different lease in November 2020, not the lease introduced as Plaintiff's Exhibit 1. (Tr. 106:4–107:20; Pl.'s Ex. 15 at 17:2–25:10.)

5.   The Court finds the evidence presented by the United States, including the testimony of Mr. Olson, to be more credible. Therefore, the Court finds the lease was signed in February 2019, in accordance with the date on the document, which both parties testified at trial that they signed. (Tr. 33:3–22; 65:19–66:10.)

6.   The February Lease was a month-to-month lease. (Pl.'s Ex. 1 ¶ 8; Tr. 58:9–11; 99:3–15.) The February Lease required Ms. Gora to pay $1,150 per month in rent. (Pl.'s Ex. 1 ¶ 10.) The February Lease required Ms. Gora to pay a security deposit of $1,100. (Pl.'s Ex. 1 ¶ 13.) Ms. Gora paid the security deposit to Mr. Olson in several payments between December 31, 2018, and March 6, 2019. (*See* Pl.'s Ex. 4.)

7.   Both Mr. Olson and Ms. Gora testified at trial that the monthly rent payments gradually increased, by agreement of the parties, beginning with $800 for February 2019 (Tr. 40:16–19; 67:6–8) to $1,150 for September 2020 (Pl.'s Ex. 4; Tr. 34:18–38:1; 67:6–69:6).

8.   The Court finds the following schedule of rental amounts paid, based on the testimony and the evidence at trial:

   a.   $350 for January 2019 (Pl.'s Ex. 4 at 1 [row for 12/31/2018], referencing payment of $900 for "Jan[uary] rent and half deposit"; half of the $1,100

4

deposit would be $550, leaving $350 as the amount of rent paid; Pl.'s Ex. 51).

    b.  $700 for February 2019 (Pl.'s Ex. 4 at 1 [row for 1/30/2019]; Pl.'s Ex. 52).

    c.  $800 per month for March and April 2019 (Pl.'s Ex. 4 at 1 [rows for 2/12/2019] ($400 for "half of March rent"); 2/27/2019 ($400 for "[r]est of March rent"); and 3/27/2019 ($800); Pl.'s Exs. 52–53).

    d.  $950 per month for the months of May 2019 through August 2020 (Pl.'s Ex. 4 [rows for 5/6/2019 to 8/10/2020]; Pl.'s Exs. 13, 53–57, 64–65, 67–69).

    e.  $1,150 per month for September and October 2020 (Pl.'s Ex. 4 at 2 [rows for 8/31/2020 ($800 for partial September rent); 9/8/2020 ($350 for the remainder of September rent); and 9/21/2020 ($1,150)]; Pl.'s Exs. 61–63; *see* Tr. 35:9–36:12; 68:8–25; 71:3–72:1.

9.    The parties do not dispute that Ms. Gora was paying $1,150 per month in rent at the time the Notice of Levy was issued. (Tr. 35:9–25; 71:3–72:1.)

10.    Ms. Gora moved out of the Eyota Property on or around July 9, 2022. (Tr. 72:2–7.)

**B.**    **Notice of Levy**

11.    The Notice of Levy issued by the IRS to Ms. Gora is dated September 23, 2020. (Pl.'s Ex. 5; Tr. 12:5–19; 70:16–18.)

12.    IRS Revenue Officer Cheryl Bird issued the Notice of Levy to Ms. Gora on behalf of the IRS, along with a cover letter explaining Ms. Gora's obligation to respond to the Notice of Levy. (Pl.'s Exs. 5–6; Tr. 26:2–18; 72:8–73:4.)

13. Officer Bird and Ms. Gora both testified at trial that the Notice of Levy and cover letter could reasonably be assumed to have been received by Ms. Gora shortly after it was issued. (Tr. 25:16–26:9; 72:8–16.)

14. The Notice of Levy states that the IRS issued it "to collect money owed by [the Olsons]" and that Ms. Gora could respond by "check or money order payable to United States Treasury." (Pl.'s Ex. 5 at 2; Tr. 12:17–13:12.) The cover letter explicitly instructed Ms. Gora that "[t]his levy attaches to all future rent payments." (Pl.'s Ex. 6; Tr. 14:13–16.) The cover letter also included Officer Bird's contact information by phone and facsimile. (Pl.'s Ex. 6.)

15. Officer Bird and Ms. Gora spoke on the phone on or about October 8, 2020. (Tr. 17:3–9; 72:19–73:1.) Following the October phone call, Ms. Gora understood that she was obligated to make her future rent payments to the IRS. (Tr. 18:8–22; 72:19–73:4.) At trial, the United States introduced evidence that Ms. Gora communicated to Mr. Olson that she knew of her obligation to the IRS. (Pl.'s Ex. 32; Tr. 41:13–15.) A text Ms. Gora sent to Mr. Olson on October 25, 2020 stated, "The lady from the IRS said I have to send my rent to them or I can get in trouble if I don't." (Pl.'s Ex. 32.) The Court finds that Ms. Gora knew of her obligation to pay future rent payments to the IRS beginning sometime in October 2020.

16. At trial, Officer Bird testified that, in addition to the inclusion of the penalty provisions on the Notice of Levy (Pl.'s Ex. 5), she explained to Ms. Gora on the October 2020 phone call the 50% penalty for failure to comply with the levy.

(Tr. 18:12–20.) The Court finds that Ms. Gora understood the potential consequences if she failed to pay her future rent payments to the IRS beginning sometime in October 2020.

17.    Officer Bird testified that Ms. Gora did not say that she did not intend to comply with the notice of levy. (Tr. 23:3–6.) Officer Bird also testified that she had issued levies on month-to-month leases and oral lease agreements before. (Tr. 30:7–14.) Ms. Gora testified that she did not notify Officer Bird or anyone else at the IRS that she disputed the effectiveness of the levy on the grounds of her month-to-month lease. (Tr. 78:8–11.) The Court finds that Ms. Gora failed to raise her claimed defense—that the Notice of Levy could not attach to future rent payments beyond the next immediate month when applied to a month-to-month lease—with the IRS at any time prior to litigation.

**C.    Check Payments under the Notice of Levy**

18.    At trial, Ms. Gora testified that she wrote and mailed checks to the IRS for $1,150 for five to seven months. (*See* Tr. 73:5–74:4.) Ms. Gora testified that she took pictures of each check, sent the picture to Mr. Olson, and then placed the check in her mailbox. (Tr. 41:25–42:8, 73:7–9; Pl.'s Exs. 33–35.)

19.    The pictures Ms. Gora provided to Mr. Olson show the front of three checks. (Pl.'s Exs. 33–35.) The checks are each for $1,150 dollars and are dated October 25, 2020 (check number 2377, Pl.'s Ex. 33); November 30, 2020 (check number 2380, Pl.'s Ex. 34); and December 30, 2020 (check number 2382, Pl.'s Ex. 35).

20.     Over the next several months, Ms. Gora sent to Mr. Olson photos of checks made

        payable to the IRS for $1,150 dollars each, dated January 18, 2021 (check

        number 2385, Pl.'s Ex. 40); February 25, 2021 (check number 2389, Pl.'s Ex.

        41); April 5, 2021 (check number 2393, Pl.'s Ex. 42); and April 26, 2021 (check

        number 2395, Pl.'s Ex. 43).

**D.    Failure to Receive Checks under the Notice of Levy**

21.     At trial, Officer Bird testified that the front of a check is not proof of payment.

        (Tr. 22:11–16.)

22.     Officer Bird testified that she spoke with Mr. Olson over the phone in January

        of 2021 and notified him that she had yet to receive any payments from Ms.

        Gora. (Tr. 20:8–21.)

23.     In her written response to Mr. Patnaik's first subpoena, Ms. Gora stated that she

        sent her bank statements to Mr. Olson "to show that the checks were being

        cashed after I received a call from a Cheryl Bird that they were not receiving

        them." (Pl.'s Ex. 10.)

24.     Mr. Olson forwarded to Officer Bird the photos of the checks he had received

        from Ms. Gora. (Tr. 20:22–21:5.) Mr. Olson then texted Ms. Gora notifying her

        that he had spoken to Officer Bird and that Officer Bird had not received the

        checks. (Tr. 42:12–16.) Mr. Olson also requested proof that the checks had

        cleared. (Tr. 42:15–16; Pl.'s Ex. 36.)

25.     Ms. Gora testified that she received Mr. Olson's text and responded, "I have my

        bank statements just have to black out my balances and will get them to you."

(Tr. 78:12–79:1; Pl.'s Ex. 36.) Ms. Gora then sent photos that appeared to show the checks being debited from her account. (Tr. 79:2–10; Pl.'s Exs. 37–39.)

26.   The photos Ms. Gora sent are of documents with the header "Transaction History" on the top of the page, with the footer "https://www.altraonline.org/AccountAccess/History" on the bottom of the page. (Pl.'s Exs. 37–39.)

27.   These documents show check number 2377 debited on November 3, 2020 (Pl.'s Ex. 38); check number 2380 debited on December 7, 2020 (Pl.'s Ex. 37); and check number 2382 debited on January 12, 2021 (Pl.'s Ex. 39). The Court finds these documents not credible.[1]

28.   At trial, Mr. Olson testified that he texted Ms. Gora in June 2021 asking for a copy of the back of one of the checks Ms. Gora had purportedly been sending to the IRS because "[the IRS] said they have not received them."[2] (Tr. 44:11–19; Pl.'s Ex. 44.)

29.   At trial, Officer Bird testified that she spoke with Ms. Gora by phone on July 29, 2021, and notified Ms. Gora that she had not received proof of any payments to the IRS. (Tr. 21:16–22:16.) Ms. Gora testified that she spoke with Officer Bird,

---

[1] The Court's credibility findings are in Part III of this Order.

[2] Ms. Gora referenced this text in her written response to Mr. Patnaik's first subpoena, saying "[Mr. Olson] messaged me in June to say they [the IRS] still were not receiving them [the checks]." (Pl.'s Ex. 10 at 1.)

possibly during the summer of 2021, and Officer Bird said the IRS was not receiving the checks.[3] (Tr. 74:20–75:10.)

30.     The Court finds that Ms. Gora was reasonably aware that the IRS was not receiving her rent payments, as directed by the Notice of Levy, in or around January 2021. The Court finds that Ms. Gora was certainly aware that the IRS was not receiving her rent payments in or around July 2021.

**E.**     **Subpoenas to Ms. Gora and Altra Federal Credit Union Concerning Payment under the Levy**

31.     Ms. Gora received a subpoena from Mr. Patnaik dated February 11, 2022, which requested "bank statements showing payments you have made to the Internal Revenue Service in satisfaction of the levy," among other things. (Tr. 81:19–82:9; Pl.'s Ex. 9 at II(2)(b).) In response to the subpoena, Ms. Gora produced documents resembling bank statements with the same "Transaction History" header and "https://www.altraonline" footer she had sent Mr. Olson. (Tr. 83:24–84:23; Pl.'s Ex. 10.)

32.     At trial, Ms. Gora testified that these documents are not official bank statements, but rather Word documents—her "own personal spending documents"—that she uses for budgeting purposes to track how much she spends each month. (Tr. 79:2–80:17.) Ms. Gora testified that she debited the checks in her personal

---

[3] Ms. Gora testified that in January 2021 she believed the checks were being cashed by someone else. (Tr. 80:15–17.) During her conversations with Officer Bird, however, Ms. Gora failed to mention that she believed the checks were being cashed by someone else because she had "a lot of stuff going on and I work two jobs, two kids in sports. I don't know." (Tr. 80:18–81:1.)

spending documents because she believed they were being cashed in January 2021. (Tr. 79:11–80:17.)[4]

33. Mr. Patnaik followed up with Ms. Gora in a March 23, 2022 letter, and enclosed a second subpoena stating, "Formal monthly statement are preferable to printouts from a website" and clarifying that Ms. Gora was "obligated" to ask Altra Federal Credit Union ("Altra") to provide her with the documents if they were not in her possession. (Pl.'s Ex. 11.)

34. Ms. Gora responded by sending what appeared to be Altra bank statements for November 2020 to January 2021 and April 2021 to May 2021. (Tr. 89:18–91:7; Pl.'s Ex. 13.) Ms. Gora conceded at trial that the apparent statements were "not real." (Tr. 90:6–10.)[5]

35. In response to Mr. Patnaik's second subpoena, Ms. Gora produced a chain of emails between Ms. Gora and Altra that purported to show the rent checks had been cashed at "Springs at the South on Broadway"; however, at trial, Ms. Gora conceded that the emails were not accurate and had been "doctored" by her co-

---

[4] Ms. Gora testified at trial that she believed Mr. Olson was stealing the checks from her mailbox at the time. (Tr. 76:14–23, 80:4–17, 81:2–18.) Ms. Gora later testified, however, that she believed a co-worker stole and cashed the checks, then falsified the Altra statements. (Tr. 92:17–25; 95:19–22.). The Court does not find any of this testimony credible, and even if it were, it would not materially alter Ms. Gora's obligation to the IRS.

[5] Ms. Gora testified that she received these falsified statements from a co-worker and did not know that they were false when she sent them to Mr. Patnaik in response to his subpoena. (Tr. 95:11–18.)

worker at the Bureau of Prisons, who also worked for Altra. (Tr. 75:19–23; 91:14–92:12; 93:12–16.)[6]

36.     The emails Ms. Gora produced to the IRS are substantively different than the emails later produced by Altra. (*See* Tr. 94:2–95:25.)

37.     At trial, Officer Bird testified that she issued a summons to Altra. (Tr. 21:8–15.) Officer Bird testified that Altra responded, "We have no record of said checks." (Tr. 21:14–15.)

**F.     Failure to Make Cash Payments under the Notice of Levy**

38.     At trial, Ms. Gora testified that in June of 2021, she and Mr. Olson agreed that she would pay him rent in cash from then forward. (Tr. 84:25–85:5.)

39.     In response to Mr. Patnaik's first subpoena, Ms. Gora produced documents that appeared to be statements for her savings account at Peoples State Bank ("Peoples") that purported to show withdrawals of $1,000 cash for rent. (Tr. 85:9–21, 96:15–97:6; Pl.'s Ex. 10.) Ms. Gora admitted at trial that these documents are not official statements from Peoples but are Word documents she maintains for budget purposes. (Tr. 84:10–85:21.)

40.     In response to Mr. Patnaik's second subpoena, Ms. Gora again sent documents that appeared to be statements for her savings account at Peoples. (Pl.'s Ex. 13.) These statements purport to show monthly withdrawals of $1,000 for the period

---

[6] As set forth in Part III *infra*, the Court does not find credible Ms. Gora's testimony that her co-worker falsified the emails.

of June 2021 to March 2022. (*Id.*) At trial Ms. Gora admitted that these documents are not official statements from Peoples but are Word documents maintained for budget purposes. (Tr. 96:18–97:6.)

41.   At trial Mr. Olson testified that Ms. Gora did not make any rent payments to him after the September 21, 2020 payment for the month of October 2020. (Tr. 62:15–22.)

**G.   Concessions at Trial Concerning Failure to Pay under the Notice of Levy**

42.   Based on the evidence introduced at trial, the Court finds that the only payments Ms. Gora made to Mr. Olson after receiving the Notice of Levy were for past due utilities. (Tr. 62:12–22; Pl.'s Ex. 4 at 2 [rows for 11/2/2020 ($200), 12/28/2020 ($200), and 12/22/2021 ($150)]; Pl.'s Exs. 58–60).

43.   Ms. Gora testified at trial that she never checked her online bank statements from Altra or Peoples, despite likely having access to online account records at the time. (Tr. 85:18–20, 91:8–13.)

44.   At trial, Ms. Gora conceded there were no "true" bank statements showing payments made to Mr. Olson after she stopped paying rent via Venmo and CashApp in September 2020. (Tr. 86:9–16.)

45.   At trial, Officer Bird testified that the IRS never received any payments from Ms. Gora. (Tr. 15:5–8 (Q: "[T]he IRS has no record that Ms. Gora made any payments in satisfaction of the levy, correct? A. That is correct."); 16:8–10 (Q: "[T]hose records show no indication that a payment was made by Ms. Gora, correct? A. That is correct.").)

46.    At trial, Ms. Gora conceded that none of her payments were delivered to the IRS. (Tr. 73:11–13.)

## III.    CREDIBILITY FINDINGS

1.    The Court finds not credible Ms. Gora's testimony that there was no written lease on the Eyota Property until November 2020, in light of Mr. Olson's testimony that the lease was signed in or around February 2019 and the evidence of payments made by Ms. Gora in February 2019 that match the rent and security deposit amounts specified in the lease.

2.    The Court finds not credible Ms. Gora's testimony that she wrote and mailed her rent checks to the IRS for November 2020 to May 2021, in light of the inconsistencies in her explanations for their failure to arrive, inability to produce valid corroborating statements from her financial institutions, and statements by Altra denying the existence of any such checks.

3.    The Court finds not credible Ms. Gora's testimony that she made rent payments in cash to Mr. Olson for June 2021 to February 2022, in light of her inability to produce valid corroborating statements, Mr. Olson's testimony, and the past practice of utilizing Venmo or CashApp for such payments.

4.    The Court finds not credible Ms. Gora's testimony that her former Board of Prisons co-worker was the source of both the doctored Altra statements and email exchange, in light of the inconsistencies in her testimony.

14

### IV.    CONCLUSIONS OF LAW ON COUNT II

1.    When a taxpayer is delinquent in paying taxes, the IRS is authorized to issue a "levy upon all property and rights to property" of the delinquent taxpayer under 26 U.S.C. § 6331. The statute expressly authorizes "continuous" levies on salary and wages, 26 U.S.C. § 6331(e), but otherwise reaches only "property possessed and obligations which exist at the time of the levy." 26 C.F.R. § 301.6331-1(a). The Treasury Regulation implementing Section 6331 provides that "[o]bligations exist when the liability of the obligor is fixed and determinable although the right to receive payment thereof may be deferred until a later date." 26 C.F.R. § 301.6331-1(a).

2.    "[S]ervice of the notice of levy reduces the property or property right . . . to the constructive possession of the United States." *United States v. Weintraub,* 613 F.2d 612, 621 (6th Cir. 1979). "A third party in possession of property upon which a levy has been issued *must* surrender the property or rights to property subject to levy." *Allstate Fin. Corp. v. United States*, 860 F. Supp. 653, 655 (D. Minn. 1994) (emphasis added). "[W]hen a third party receives a notice of levy, it must 'immediately surrender the property to the IRS.'" *Heaton v. YRC, Inc.*, No. 09-CV-2807 (RHK/JJK), 2009 WL 5103228, at *2 (D. Minn. Dec. 17, 2009) (quoting *Weintraub*, 613 F.2d at 621).

3.    Upon receiving a Notice of Levy from the IRS, a "failure to comply with a levy will result in the third party's personal liability 'in a sum equal to the value of the property or rights not so surrendered.'" *Heaton*, 2009 WL 5103228, at *2

(quoting 26 U.S.C. § 6332(d)(1)). However, a recipient who complies with the levy is immunized from any liability they may incur for doing so. *Id.*

4.      The Supreme Court has stated that there are "only two" circumstances in which it is permissible not to comply: if Ms. Gora did not possess the property or rights to the taxpayer's property at the time of the levy or if the property was "subject to a prior judicial attachment or execution." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 721–22 (1985) (quotation omitted). Neither circumstance existed when Ms. Gora received the Notice of Levy, and neither circumstance arose during the period she was subject to the levy.

**A.      The Notice of Levy Properly Attached to Ms. Gora's Possession of the Property.**

5.      It is undisputed that Ms. Gora and Mr. Olson signed a written lease that stated it was for a "month-to-month" term and set rent at $1,150 per month. (Pl.'s Ex. 1; Tr. 19:22–24; 33:3–13; 65:19–66:10.) It is likewise undisputed that Ms. Gora was paying $1,150 in rent per month at the time the Notice of Levy was issued. (Tr. 35:9–25; 71:3–72:1.) It is also undisputed that Ms. Gora moved out of the Eyota Property on or around July 9, 2022. (Tr. 72:2–7.) It is similarly undisputed that in or around October 2020 Ms. Gora understood her obligation to pay her rent to the IRS. (Tr. 18:8–23; 72:19–73:4.)

6.      The language in the lease could be interpreted as a periodic tenancy with a period of one month or a tenancy at will. Even crediting Ms. Gora's argument that the lease agreement was merely oral at the time of the levy, oral month-to-month

leases still create tenancies at will. *See Hagen v. Bowers*, 233 N.W.2d 822, 823 (Minn. 1930).

7.    This Court finds that the lease was signed in February 2020. However, even under Ms. Gora's assertions that the lease was not signed until November 2020, the signature would merely have ratified the parties' existing oral agreement, as evidenced by their course of dealing. *See Anderson Mktg., Inc. v. Maple Chase Co.*, 241 F.3d 1063, 1065 (8th Cir. 2001) (affirming as reasonable a jury verdict that a valid contract was formed through a party's signature and backdating); *see also PRO Commercial LLC v. Mallory Fire Prot. Servs., Inc.*, No. 15-1420, 2016 WL 7395728, at *6 (Iowa Ct. App. 2016) ("Oral agreements can later be memorialized into written agreements").

8.    In Minnesota, in a tenancy at will, "the tenant holds possession by permission of the landlord but without a fixed ending date." Minn. Stat. § 504B.001, subd. 13; *see Annex Props., LLC v. TNS Research Int'l*, 712 F.3d 381, 383 (8th Cir. 2013).

9.    Ms. Gora therefore was in possession of the Olsons' property from the issuance of the Notice of Levy until she moved out on July 9, 2022. Because Ms. Gora was in actual possession of the property, it is not necessary to reach the question of whether the month-to-month lease created a right beyond the next month's rent to which the levy could attach. However, in the interest of fully addressing the arguments before this Court, the issue will be considered but will not be determinative.

10. The Court concludes that the Notice of Levy properly attached to the entirety of Ms. Gora's rent obligations for the months of November 2020 through July 2022.[7]

**B.    Ms. Gora Had Fixed and Determinable Obligations Under the Lease.**

11. Ms. Gora contends that the Notice of Levy was not legally effective beyond the next month's rent after the levy was issued due to the month-to-month nature of the lease. There is minimal guidance available to the Court on this particular question of law.

12. With respect to the question of whether month-to-month leases—either oral or written—create fixed and determinable obligations, the Eighth Circuit has held that "[t]he unqualified contractual right to receive property is itself a property right subject to seizure by levy, even though the right to payment of the installments has not matured at the time of the levy." *St. Louis Union Tr. Co. v. United States,* 617 F.2d 1293, 1302 (8th Cir. 1980) (holding that a levy attached to trust dividends and income despite necessarily variable returns on the performance of the assets due to a "fixed contractual obligation to pay the

---

[7] Even assuming Ms. Gora properly wrote and mailed checks to the IRS for the months of November 2020 to May 2021, she still failed to pay rent while living in the Property for over a year for the months of June 2021 through July 2022. However, the Court does not find Ms. Gora's testimony that she mailed checks credible and concludes that Ms. Gora failed to pay rent for the months of November 2020 through July 2022.

Income to [the taxpayer] as it was earned. The IRS could and did seize that right to satisfy his unpaid tax liabilities.").

13.    Here, as in *St. Louis Union Trust*, the Olsons had an unqualified contractual right to receive monthly rent payments from Ms. Gora. Ms. Gora's obligation to pay rent, like the trust's obligation to distribute income, was contingent on future events—namely here, the parties' decision to maintain the lease agreement each month.[8] In one sense, Ms. Gora's obligation was even more readily determinable than the trust company's in that it was set at a fixed amount of $1,150, rather than variable based on asset performance.

14.    The Ninth Circuit has likewise held that "determinable" merely "requires only that the sum be capable of precise measurement in the future." *United States v. Dent*, 669 F. App'x 848, 849 (9th Cir. 2016) (quotation omitted). There is no dispute that Ms. Gora's obligations were subject to precise measurement—she testified that, upon receiving the Notice of Levy and speaking to Officer Bird,

---

[8] Under Minn. Stat. § 504B.135(a), "[a] tenancy at will may be terminated by either party by giving notice in writing. The time of the notice must be at least as long as the interval between the time rent is due or three months, whichever is less." However, under Emergency Executive Order 20-14, the Olsons could not have terminated the lease for much or all of the relevant time period due to Minnesota's COVID eviction moratorium. (*See* Tr. 58:17-24.) A law phasing out the eviction moratorium went into effect beginning in July 2021, with the moratorium continuing in place through June 1, 2022, as to tenants who failed to pay rent but had a pending application for COVID rental assistance through RentHelpMN. 2021 Minn. Sess. Law 1st Special Session Chapter 8 (H.F. 4) at Article 5.

she understood that she was to make her rent payments of $1,150 to the IRS. (Tr. 72:23–73:4.)

15.    Cases that have specifically addressed month-to-month leases have uniformly concluded that levies attach to a renter's obligations under the lease. *KMG Props. v. I.R.S.*, No. 08-CV-1544, 2009 WL 1885930, at *8 (W.D. Pa. June 30, 2009) ("The fact that [the] lease was a month-to-month lease does not affect the levy's attachment to future payments. The levy was effective to reach future payments not by reason of the fact that it continued to operate beyond the time at which it was made, which it does not, but rather because the levy reached Plaintiff's then existing right to the future payments under the lease, not the future payments themselves."); *United States v. Halsey*, No. 85-1266, 1986 WL 9466, at *1 (C.D. Ill. June 16, 1986) (holding the levy was effective to attach to monthly rent payments made pursuant to an oral lease).

16.    The Court's conclusion is supported by policy, as well. If month-to-month lease obligations were not subject to levy, the IRS would need to issue a new levy every month to capture monthly rent payments. That is neither practical nor contemplated by the statute. To the contrary, the Supreme Court has explained that "[t]he statutory language 'all property and rights to property' . . . is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Nat'l Bank of Commerce*, 472 U.S. at 719–20; *see also State Farm Life Ins. Co. v. Howell*, 76 F.3d 216, 217 (8th Cir. 1996). The Supreme Court has also explained that levies are designed to be "provisional

20

remed[ies]" that are "quick and relatively inexpensive." *Nat'l Bank of Commerce*, 472 U.S. at 721. A rule that required serial levies to capture month-to-month rent obligations would seriously hinder the IRS's collection efforts.

17. The Court concludes that Ms. Gora's obligations under the month-to-month lease were sufficiently fixed and determinable for the Notice of Levy to attach. The Court concludes further that Ms. Gora's possession of the Olsons' property was sufficient for Notice of Levy to attach, without analyzing the nature of the lease.

## V.    CONCLUSIONS OF LAW ON COUNT III

1. Under 26 U.S.C. § 6332(d)(2), this Court must impose a penalty equal to 50% of the amount subject to levy if a levy recipient lacks reasonable cause for failing to surrender the property. Reasonable cause exists where there is a bona fide dispute concerning the legal effectiveness of the levy. 26 C.F.R. § 301.6332–1(b)(2). Ms. Gora contends that her present argument concerning the legal effectiveness of the levy to attach to a month-to-month lease constitutes reasonable cause.

2. If there is no reasonable cause, then the 50% penalty is "mandatory." *See United States v. Matthews*, No. CY-91-3006-RJM, 1992 WL 370780, at *10 (E.D. Wash. Aug. 20, 1992); *In re Hill*, No. 14-10434, 2015 WL 628335, at *9 (Bankr. W.D. Tenn. Jan. 14, 2015).

3.      As the Court concluded above, there are "only two" circumstances in which it is

permissible not to comply with a levy, *see Nat'l Bank of Commerce*, 472 U.S. at

721–22, and neither are present here.

4.      The recipient of a levy "proceeds at its own peril if it refuses to honor the levy."

*Allstate*, 860 F. Supp. at 656–57. The Ninth Circuit has stated that "[e]ven in

somewhat doubtful circumstances the liabilities and penalties may be imposed."

*Farr v. United States,* 990 F.2d 451, 456 (9th Cir. 1993). Not only did Ms. Gora

fail to comply with the levy, but she also failed to raise her present argument at

any time prior to this suit.

5.      Ms. Gora was aware of her duty to comply with the Notice of Levy as well as

the 50% penalty for failure to comply with the levy as of October 2020. (Tr.

18:8–23; 72:19–73:4; 18:12–20.)

6.      Ms. Gora failed to inform anyone at the IRS that she did not intend to honor the

levy because she believed her rental obligations were not fixed and

determinable. Ms. Gora instead told Officer Bird and Mr. Olson that she was

placing the checks to the IRS in the mail. (Tr. 21:16–22:16; 74:20–75:10.)

Furthermore, Ms. Gora produced misleading and incorrect documents to Mr.

Olson as proof that the checks were being cashed. (Tr. 78:12–79:10.) Ms. Gora

likewise produced "statements" that were in fact Word documents she created

in response to two government subpoenas. (Tr. 79:2–80:17; 84:25–85:14;

96:24–97:6.) Ms. Gora also produced statements and an email chain that she

22

admitted were "doctored" in response to the IRS's second subpoena. (Tr. 91:14–94:1.)

7.    The Court concludes that Ms. Gora lacked reasonable cause for failing to honor the levy. Ms. Gora's lack of candor to the Olsons and the IRS exacerbates the *post-hoc* nature of Ms. Gora's present argument that the levy was ineffective.

## VI.    AMOUNT OF LIABILITY

1.    The recipient of a levy who fails to honor it, such as Ms. Gora, becomes personally liable to the government in the amount of the value of the property or rights to property subject to levy in the recipient's possession, plus interest thereon. 26 U.S.C. § 6332(d)(1).

2.    The Court concludes that Ms. Gora is personally liable to the government for monthly rent of $1,150 owed to the Olsons for the months of November 2020 through July 2022—totaling $24,150—plus interest on that amount. If recovered, this portion of Ms. Gora's liability will be credited against the Olsons' tax liability. 26 U.S.C. § 6332(d)(1).

3.    Interest continues to run at the statutory underpayment rate established by 26 U.S.C. § 6621 through the date of judgment. The parties shall meet and confer and file a proposed calculation of the amount of interest to be entered, noting any areas of disagreement, within 14 days of this Order's date.

4.    Ms. Gora is also liable to the United States for the 50% penalty on the amount subject to the levy under 26 U.S.C. § 6332(d)(1)—totaling $12,075. This penalty

also applies to interest assessed. *See* 26 U.S.C. § 6332(d)(1) (including interest as an amount recovered under paragraph (d)(1)); 26 U.S.C. § 6332(d)(2) (establishing the penalty as 50% of the amount recoverable under (d)(1)). This penalty shall not be credited against the Olsons' tax liability. 26 U.S.C. § 6332(d)(2).

Accordingly, based on the foregoing findings of fact and conclusions of law, **IT IS HEREBY ORDERED** that:

1.  Defendant Joanie Gora is liable to the United States on Counts II and III of the Amended Complaint;

2.  Pursuant to 26 U.S.C. § 6332(d)(1), Ms. Gora is personally liable to the United States in the amount of $24,150, plus interest;

3.  Pursuant to 26 U.S.C. § 6332(d)(2), Ms. Gora is liable to the United States for a penalty in the amount of $12,075, plus an amount equal to 50% of the interest recoverable under 26 U.S.C. § 6332(d)(1); and

4.  The parties shall confer and file a joint proposed calculation of the amount of interest, noting any areas of disagreement, within 14 days of this Order's date. The Court will enter an amended judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  March 5, 2025

_s/  John F. Docherty_
JOHN F. DOCHERTY
United States Magistrate Judge

25